MARTIN v. MARTIN. (No. 7627.)

(Court of Civil Appeals of Texas. Galveston. Nov. 21, 1918. Rehearing Denied Dec. 12, 1918.)

1. GIFTS ⬥25—PAROL GIFTS OF LAND.

It is necessary to the validity of a parol gift of land that possession be delivered and valuable improvements made with the knowledge or consent of the donor, and the mere taking of possession and making of improvements of insignificant value is not sufficient where the value of the rents exceeds that of the improvements.

2. GIFTS ⬥49(4)—PAROL GIFTS OF LAND—EVIDENCE.

One seeking to recover title to land upon an alleged parol gift, as against the holder of a legal record title, must establish, by full, clear, and satisfactory evidence, a gift of the land, the terms and conditions of which must

be shown free from ambiguity, and not merely an expression of an intent to make the gift at a future time.

**3. GIFTS ⊚⇒49(4)—LAND—EVIDENCE.**

Evidence *held* insufficient to establish a parol gift of land relied on by defendant, the terms of the gift not being clearly shown, and no making of improvements of substantial value being disclosed.

**4. GIFTS ⊚⇒16—VALIDITY—EXECUTION.**

To constitute a valid gift inter vivos, there must be a gratuitous and absolute transfer of the property from the donor, taking effect immediately, and fully executed by delivery and acceptance.

**5. SPECIFIC PERFORMANCE ⊚⇒47 — IMPROVEMENTS.**

When a purchaser by parol has been fully compensated for his improvements, or has gained more by his possession than he has expended in improvements, they will not avail him as a ground for specific execution.

**6. GIFTS ⊚⇒49(1)—PAROL GIFTS—EVIDENCE.**

Alleged parol gifts asserted for the first time after the death of the donor, to be upheld must be supported by evidence that is full, clear, and free from uncertainty.

Appeal from District Court, Leon County; S. W. Dean, Judge.

Suit in trespass to try a title by Mrs. Mary A. Martin, as executrix of the last will of William Martin, deceased, against J. M. Martin, who filed a cross-bill. From a judgment for defendant, plaintiff appeals. Reversed and rendered.

Graves & Houtchens, of Ft. Worth, for appellant.

J. M. Chathañ, Wm. Watson, and Joe H. Seale, all of Centerville, for appellee.

LANE, J. This is a suit in trespass to try title to 998¼ acres of land in Leon county, Tex., brought by appellant, Mary A. Martin, as executrix of the last will of William Martin, deceased, against J. M. Martin, generally called "Jess Martin."

Defendant answered by general denial, plea of not guilty, and by cross-bill, in which he alleged that in the month of August, 1913, his father, William Martin, deceased, had made a parol gift to him of the specific 160 acres of land out of the said 998¼ acres of land sued for by Mrs. Martin, which is described in his cross-bill. He further alleged that, relying upon said gift, he had entered upon said 160-acre tract, and had made valuable improvements thereon in good faith, and therefore he was the equitable owner of the same, for the title to which he prayed judgment.

The cause was tried before the court without a jury, and judgment was rendered in favor of defendant for the 160 acres of land claimed by him, said judgment reciting, however, that said 160 acres was to be subject to the payment of one-sixth of an indebtedness of about $8,000 which was owing by William Martin as a part of the purchase money for said 998¼ acres.

The main and controlling question presented by this appeal, and which if decided in favor of appellant will render the discussion of the one other assignment unnecessary, is, Was the evidence sufficient to support the judgment of the trial court confirming the alleged parol gift of William Martin, deceased, to appellee, Jess Martin?

Appellant's proposition is, in effect, that one who seeks to recover title to land from another who holds the legal record title, solely upon a claim of parol gift, must establish by clear and satisfactory evidence, free from ambiguity and doubt, first, the gift in clear and unequivocal terms; second, that he entered into possession of the land under and by virtue of the gift; and, third, that after such entry he did, in good faith and because of said gift, make permanent and valuable improvements on said land; and that as appellee relied for his title to the land solely upon the alleged parol gift, and as the evidence wholly fails to establish the three essential elements of a parol gift which would vest title to said land in him, the trial court erred in divesting Mrs. Martin of the legal title thereto and vesting the same in appellee by a judgment in his favor.

The undisputed evidence shows that the 998¼ acres were conveyed to William Martin, deceased, in the spring of 1913; that it was the community property of himself and his wife, Mary A. Martin, appellant herein, and that they held a fee-simple title thereto; that they moved upon said land in 1913 and resided thereon as their homestead; that as part payment of the purchase price of the land William Martin assumed the payment of an indebtedness of his vendor for the sum of $8,000, which was a lien upon the land, no part of which had been paid at the date of the trial of this cause. It also shows that William Martin and wife, Mary A. Martin, had seven children, four daughters and three sons, Jess, the appellee, being one of them. All the daughters, Jess, and one of the other sons were married and lived separate and apart from their parents. All the sons moved upon the land with their parents. Some time after moving upon the land Jess, with his family, moved into and occupied a tenant house on the premises as a tenant of his father during the year 1913, said house so occupied by him being on the 160 acres claimed by him. William Martin, the father, did considerable amount of improving on the land, such as clearing land and putting much of it into a state of cultivation. A part of

the land so cleared and reduced to a state of cultivation was by help employed and paid for by William Martin, but the most of it was done upon agreement with the parties who cleared the land that such parties should have the crops grown upon the land so cleared by them, respectively, free of rent for one year as their compensation. All three sons, as well as other renters, did some of the clearing. At the time of the purchase of the 998¼ acres there was only about 20 acres of the 160 acres claimed by appellee cleared, and at the time of the death of William Martin, in June, 1916, there was cleared on said 160-acre tract about 100 acres. The clearing done by appellee was not all on said 160 acres, but some of it was on other parts of the 998¼ acres. During the life of William Martin he rented the larger portion of the cleared land on said 160-acre tract to tenants other than appellee, and collected the rents therefor, and during such time appellee cultivated some of the land on said 160 acres and some on other parts of the land. Up to the time of the death of William Martin he had charge and control of the entire 998¼ acres, and made all the contracts of rental with the several tenants and collected and retained the rents due. William Martin paid all taxes due on the entire 998¼ acres and the interest on the $8,000 debt. William Martin died on the 26th day of June, 1916, and left a will by the terms of which he devised and bequeathed to his wife, Mary A. Martin, all his estate, both real and personal, which will was duly probated in August of the same year. Shortly after the probate of the will appellee notified his mother, Mary A. Martin, that he claimed the 160 acres, now claimed by him, under a parol gift made to him by his deceased father. He never at any time before his father's death asserted any claim to said 160 acres as far as shown by the evidence. Appellee paid rent to his mother, for such land as he cultivated upon said 160 acres, for the year 1916, after the death of his father. The rental value of the 160 acres for 1914, 1915, and 1916 was about $750 to $800.

The material testimony offered by appellee to establish the parol gift alleged by him, and to prove the value of improvements made on the land claimed by him, was substantially as follows:

Mrs. J. M. Martin, wife of appellee, testified:

"I heard Mr. Martin talking with Jess, and explaining where his lines were, and that his land begins with what is known as the old Bill Brown house, and runs 486 yards north and then east, parallel with the south line of the farm, far enough to make 160 acres. I heard Mr. Martin tell him that in the fall after we moved there in the summer. Mrs. Martin was with her daughter, Mrs. Grace Hooper, in Archer county at the time. I heard the conversation between my husband and his father, and we were living at the place we now live. Mr. Martin and Jess made the 'A' stick, and went to the corner, and then went down to south line, measuring it, and then came to the house and had that conversation in which Mr. Martin told Jess that that was his land and his line as near as he could get to it with a yardstick like that."

Lum Jones, witness for appellee, testified:

"Mr. William Martin had a conversation with me and Mr. Jess and others in which he pointed out certain land. One day me and him and Mr. Jess Martin and Sam Roberts was going down the road from the house to the water gap from Mr. William Martin's house. We was going down there, and he had an ax on his shoulder, and got to a tree, and he spoke and says, 'Here is where your line comes Jess on this tree,' and he cut on it with an ax. Jess' land was on the right-hand side of the tree from the house; that was the south side of the turning row. The tree that he hacked was on the line with the turning row; that is, the turning row that was down in the field. Mr. Jess had some clearing down over there close to my brother-in-law, at the corner and near Mr. Jess' house."

Wiley Williams, for appellee, testified:

"I did some work for Mr. Martin about three or four years ago, in the spring of the year, such as cutting fence posts for fencing. I had a conversation with Mr. Martin with reference to his land while he and I was splitting some posts. He got to talking about the trees being so crooked, and he says that if he could get Jess to agree 'I would sell this land and put the money in my pocket and leave here.' I asked him why; and he said, 'Well, every tree I have struck since I have been here is crooked,' and he reckon everything else was crooked. He said that if he could get Jess to agree they would sell the land."

Lum Colbert, witness for appellee, testified that a short while before William Martin's death he (witness) had a conversation with him; that in that conversation Martin told witness that he was going to die, and that he wanted his business arranged so that his boys would be protected; and he said, "There is only one that knows anything about what he is going to get and where it is, and that is Jess." He testified further as follows:

"I remember Jess Martin building a house before Mr. Martin died. Mr. Martin spoke to me about the house. He was talking about Jess being dissatisfied with the old house, and said that he had it in his head to build a new one, and says, 'I tried to get him to wait until he made a crop, and he could build a good house.' He said he was not satisfied with the old house, and now he could do just anything he liked about the house.

"Jess never did pay us any rent until last year; last year is the first time Mr. Jess Martin paid us any rent. Mrs. Martin left last year soon after Mr. Martin died, and gave us an order on everybody on the place for rent,

and of course she gave us Jess' name. When Jess came in and Mr. Hale, our bookkeeper, told him of this, he kicked about it, and after I explained the matter to him that Mr. Martin owed us an account, and that Mrs. Martin wanted the rent to pay that account, and even if he did not owe any rent and it was his own land it did not amount to much, and he says, 'Under those conditions you can take the rent.' The reason I know that Jess did not pay any rent before this was because Mr. Martin did his business with us."

In explanation, however of the testimony of the witness as to payment of rents by appellee, it may be well to state that the two brothers of appellee who lived on the premises testified that William Martin had told his son Jess, appellee, to keep the rent until he had paid Colbert and Hale what he (Jess) owed them; that is, that he pay Colbert and Hale first, and that, if anything was left, then pay him the rent.

Appellee did not testify to the alleged gift by his father to him, presumably because his testimony as to conversations and transactions with his deceased father were inadmissible, but he did testify on direct examination that he moved into the house on the 160 acres claimed by him in the fall of the year 1913; that at that time the house was in bad shape and leaked badly; that he lived in the old house a year or two, after which he tore it down and built it over; that in rebuilding it he used some of the old lumber, but that the new material and work of building was worth about $150 to $200; that he did not keep any memorandum of such expenditures or of the labor, but he judged it was about the sum named; that he built some fences, which cost him $15 to $18; that he also built a crib with logs he and others cut from the premises, which he valued at about $150 and that the land he cleared on the tract was worth about $50; that he had never been paid for making such improvements, and that he made same in good faith, relying upon the alleged parol gift alleged by him.

On cross-examination he testified, among other things, that he paid for the lumber that went into the house remodeled on the 160-acre tract; that he knew Jim Lusk hauled one load of lumber to his house, but that he would not swear that all of it was used on his house; that he had no idea how much of it was used in remodeling the house, and would not attempt to make an estimate, but that he had a good idea of the cost of the portion of it that was used on the house, and thought it was $25 or $30, though he would not be positive about that; that his father paid for the lumber in the first instance, and that he paid his deceased father for his portion thereof; that he did not pay his father in cash or with a check, but that, as his father owed him somewhere about the value of his part of the lumber, they agreed to call it even. He testified that he built a barn on the 160 acres; that he paid about $10 for the lumber that was used in building the same; that the barn was built of logs cut from the land and covered with oak board split on the premises. Continuing, he testified as follows:

"I cannot say how long it took us to remodel the house, but it seems to me that it was about two or three or four days, but I would not be positive. I did not pay Frank any money, but I paid Bud some. My father may have helped fix a window frame, but that is all he did, and I did not pay him anything.

"Jim Lusk also helped some on the house. I think the lumber cost $25 or $30, and I paid Bud, if I am not mistaken, $16; it was in the neighborhood of $16 that I paid him for work on the house. I paid him in cash in Mr. Jim Britton's store. I never paid him all of it, because there was a little difference between us, and when we settled up I paid him the difference; but I would not be positive just how much it was—whether it was $8 or $10 or $15, but I will swear that it was as much as $8, but am not positive that I paid him more than that. I have not paid Jim Lusk all I owe him yet. I owe him some yet. I think his work on the house was $16 for about 16 days. He did not do any of this work himself, but I hired one of his boys to plow for Mr. Griffin while Mr. Griffin helped me on the house; that is, he swapped work with Mr. Griffin. Jim's work came to $15 or $16, and I have not paid him anything yet, for I have not had the money. Mr. Tittle was helping on the house, he cut the rafters one evening, but did not charge anything. No one else helped that drew any pay that I can remember now. The most of the lumber that went into the new house was the old lumber taken out of the old house, and about $25 or $30 worth of new material, and that included everything in the way of material outside of some work."

"Mr. Griffin also worked on the barn, but I do not remember what I paid him. I paid Mr. Griffin at the rate of $1 per day, but I do not know how much time he put in, but am sure he put in as much as half a day. We were one day raising the barn, so that would be $1. I think he made some boards, but I do not remember what I paid him for that, and I do not know how long he was at it. He made some boards up at the blacksmith shop, and kept his own time, and I couldn't say whether it was as much as 5 days or not, but I suppose it took him as much as 3 or 4 days or 5 or 6. He was making the boards by the hundred, and charged from 20 to 30 cents per hundred, and he cut I think between two or three thousand boards (2,000 or 3,000). Lum Jones also worked on that barn the day we raised it, and I am not positive whether he helped haul the logs or not, and I, think we gave him a day's work, which would be $1. Bill Brown also worked on the barn one day, and am not positive whether Bill Brown and Lum Jones cut those logs and drew time for that or not. I think Mr. Griffin cut the logs, and I am pretty sure that I paid for it. I do not think Bud or Frank could have cut the logs themselves. I do not know just what was paid for that, and I am not willing to swear that it was as much as

$5 and I do not know how many days that it would take to go into the bottom and cut the logs, but I should judge that it would take about 5 days, and paid $1 per day. No one else worked on the barn that I can remember."

Continuing, he testified that he built some hog wire fence; that the wire used on said fence cost about $9 to $12; that he also put some chicken wire around his garden, but did not remember what it cost him, but thought it cost him about $18; that he thought his father helped him put the wire around the garden.

Testifying further he said:

"I cannot be positive about how much land I cleared off, but there was between 10 and 15 acres that I cleared up in one spot last year. The work may have been done the year before, but last year was the first crop on it. I cleared up some of this sandy field. The sandy field is not west of the land I claim, but part of it is on the land that I now claim. It is true that my father gave Bud, Frank, and myself and Mr. Griffin and all of the boys all they made on a part of this land for clearing it up. That I cleared in the bottom last year he was giving all that I could make on it for two years for clearing it; that is the 15 acres that I have been speaking about. I do not know how much I cleared up on the sandy hill. I could not swear that it was as much as 5 acres that I cleared or paid for the clearing, but it was 3 or 4 acres or something like that. The other land that I spoke of wasn't in the boundaries of the place where I now live; that is, it is out of the boundaries of the 160 acres that I now claim; that is, I have cleared up 3 or 4 acres of land on the tract that I now claim, but I paid for some clearing down in the bottom that is on the 160 acres, but I do not know how much. I expect there was about 25 or 30 acres of that, and maybe 40 acres, that was within the boundaries of the 160 acres, and on the lower end next to the river, 35 or 40 acres, but a part of it may be on the outside of the 160 acres I now claim. I don't know exactly where the line crosses. I have never stepped it, and do not know where the line would be, and I have never surveyed it. I mean that I do not know where the east boundary line of the 160 acres I now claim is located. I do not know even until this day where that line is. It has never been surveyed nor has it been pointed out by anybody. For that reason I cannot say how much of that land that I had cleared is on the 160 acres I now claim."

"I alleged in my petition that the barn was worth $150, and I have testified on direct examination that it cost that much, and according to the itemized account I have given on cross-examination, according to the figures given for material and labor, it cost me $37.10, leaving $112.90 unaccounted for. I might not have figured that as close as you did and have forgotten now what that difference was for. The only explanation that I have to offer is that I did not figure it that close when I gave the estimate to my attorneys to be inserted in the petition.

"I alleged in my petition that I paid for four spools of net wire of the value of $18, and I testified that the spools cost from $3 to $4,

and that would make $16 at the most. I also alleged in the petition for the labor of putting up this hog fence was $15, but would not be positive about paying that much for labor. I did not pay Bud or Frank anything, but I had a man hired, and if I am not mistaken I had Willie Newsome, hired, but I do not remember whether I paid him $15 or not."

"A part of the land that I farmed ever since I have been there has been on other parts of the farm than on the 160 acres I claim. Jim Lusk cultivated a part of this 160 acres in 1915 and paid the rent to my father. Bud might have cultivated a part of the 160 acres and paid the rent to my father for 1915. In 1915 I cultivated 15 or 20 acres up in the sandy field that is on the 160 acres that I claim."

"Yes; Jim Lusk farmed a portion of the 160 acres last year and paid rent to my father. I swapped land with my father last year. I did not swap land with Bud last year, and I did not know that he had any of the 160 acres, although he might have had in a little of the sandy patch, and if he rented any of it he rented it from my father and not from me. I would not be positive who tended a portion of that 160 acres last year. None of them paid me any rent; they all paid to my father."

For the purpose of discussing and passing upon the sufficiency of the evidence to sustain the judgment of the trial court, we have in the foregoing tried to make a fair statement of the undisputed evidence, and of the proof offered by appellee for the purpose of establishing his title, by proof of the parol gift alleged by him and of matters incident thereto, and have disregarded much evidence offered by appellant strongly contradictory of appellee's evidence upon the facts relative to the parol gift alleged by him and the value of the improvements placed on the land.

[1] It is well settled in this state that it is necessary to the validity of a parol gift of land that the possession be delivered, and substantial and valuable improvements made, with the knowledge or consent of the donor, upon the faith of such gift; and that the mere taking of possession, if any in the case, and making of improvements of insignificant value, is not sufficient, especially where, as here, the value of the rents largely exceeds that of the improvements. Wooldridge v. Hancock, 70 Tex. 21, 6 S. W. 818; Eason v. Eason, 61 Tex. 225; Combest v. Wall, 102 S. W. 147; Ann Berta Lodge v. Leverton, 42 Tex. 18.

[2] It is also well settled in this state that where one seeks to recover title to land upon an alleged parol gift, as against one who holds the legal record title, he must establish by full, clear, and satisfactory evidence a gift of the and, the terms and conditions of which must be shown to be clear and free from ambiguity and doubt, and not merely an expression of an intent to make the gift at some future time. Murphy v. Stell, 43 Tex. 123; Snover v. Jones, 172 S. W. 1122.

[3-6] The statement and acts of William Martin, testified to by the witnesses Mrs. J.

M. Martin, Lum Jones, Wiley Williams, Lum Colbert, and appellee, Jess Martin, relative to the alleged gift, cannot be said to be evidence of a gift free from ambiguity and doubt. The testimony of these witnesses is not such full, clear, and satisfactory evidence as is required to take a parol agreement for the transfer of title to land out of the statute of frauds, nor it is sufficient to warrant a finding that William Martin had given appellee the land claimed by him, or that he had unconditionally promised it to him in the future. But, on the contrary, the evidence as a whole shows that William Martin had and retained charge and control of said land, making rental contracts with tenants, cultivating a part thereof year after year; that he contracted during said years for the clearing of parts of said land, giving to the tenants so clearing the same use of the land so cleared by them, respectively, for one year for their labor; that he assessed the land for taxes, and paid all taxes due thereon up to date of his death; and that he alone paid the interest due on the $8,000 debt against the entire 998¼-acre tract.

The testimony of appellee, J. M. Martin, the only witness who testified as to the value of improvements which he alleges he made on the land, clearly shows that the value of such improvements was of insignificant amount, and much less than the value of the rents of the land.

"To constitute a valid gift inter vivos, there must be a gratuitous and absolute transfer of the property from the donor to the donee, taking effect immediately, and fully executed by a delivery of the property by the donor and an acceptance by the donee. Such gifts can have no reference to the future, but go into immediate and absolute effect. 14 Am. & Eng. Ency. Law (2d Ed.) p. 1015."

"It has been said that, to establish a gift by parol, the proof must be clear and free from all ambiguity and doubt. Combest v. Wall, 102 S. W. 147."

"In order to remove a parol contract for the sale of land from the operation of the statute of frauds, its terms and conditions must be clear and free from all ambiguity and doubt, and it must be established by full, clear, and satisfactory evidence. Snover v. Jones, 172 S. W. 1122."

In Ann Berta Lodge v. Leverton, 42 Tex. at page 26, it is said:

"It is well settled, when the purchaser has been fully compensated for his improvements,

207 S.W.—13

or has gained more by his possession than he has expended in improvements, they will not avail him as a ground for specific execution. Wack v. Sorber, 4 Wheat. 387; Eckert v. Eckert, 332; O'Reiley v. Thompson, 2 Conn. 271."

Alleged parol gifts, asserted for the first time after the death of the donor, to be upheld ought to be above question or suspicion at all times; but more especially when they render inoperative, as they would in this case, the provisions of the will made by the alleged donor. The evidence to support them ought to be full and clear and free from uncertainty, for the temptation to seize upon statements made by the deceased alleged donor might be too often yielded to under the influence of interest or promptings of avarice, and produce most grievous wrongs. The facility with which such alleged gifts are sometimes proved is suggestive of great caution in weighing the evidence adduced to sustain them. To doubt them ought to be to deny them.

" 'Around every other disposition of the property of the dead the legislative power has thrown safeguards against fraud and perjury. Around this mode (donatio mortis causa) the requirement of actual delivery is the only substantial protection, and the courts should not weaken it by permitting the substitution of convenient and easily proved devices.' Keepers v. Fidelity Title & Deposit Co., 56 N. J. Law, 303 [28 Atl. 585], 23 L. R. A. 184 [44 Am. St. Rep. 397].

"Mindful of the facility with which, after the alleged donor is dead, fraudulent claims of ownership may be founded on pretended gifts of his property, asserted to have been made while he was living, it is but a salutary precaution which demands explicit and convincing evidence of every element needed to constitute a valid donation, whether it be a donation inter vivos or mortis causa. Even then fraudulent claims may prevail, but the rigid requirement of the clearest proof will at least diminish the number." Whalen v. Milholland, 89 Md. 212, 43 Atl. 43, 44 L. R. A. at pages 212, 213.

We are of the opinion that the evidence adduced to prove the alleged gift of the 160 acres of land claimed by appellee is too inconclusive and vague to support the appellee's claim.

For this and other reasons we have assigned, the judgment of the trial court in favor of appellee is reversed, and judgment is here rendered in favor of appellant for the entire 998¼ acres of land sued for by her.

Reversed and rendered.