HARDY v. WRIGHT. (No. 7969.)

(Court of Civil Appeals of Texas. Ft. Worth. May 9, 1914. Rehearing Denied June 7, 1914.)

1. VENDOR AND PURCHASER (§ 278*)—VENDORS' LIENS—ENFORCEMENT — LIMITATIONS.

The right of a vendor who sold land in 1893 to enforce his vendor's lien for the price is not destroyed by lapse of time, where the vendee, who held possession of the land and paid taxes, did not repudiate the vendor's title; Rev. St. 1911, art. 5694, prescribing a limitation to the enforcement of vendors' liens, not applying to conveyances made before 1905.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 776, 777; Dec. Dig. § 278.*]

2. VENDOR AND PURCHASER (§ 281*) — VENDORS' LIENS — ENFORCEMENT — EVIDENCE — SUFFICIENCY.

In an action to foreclose vendor's lien notes upon land, evidence *held* insufficient to show that the vendee or his grantee had repudiated the vendor's title.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 792–794; Dec. Dig. § 281.*]

Appeal from District Court, Throckmorton County; Jno. B. Thomas, Judge.

Trespass to try title by L. H. Hardy against T. J. Wright. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

Thorpe & Reynolds, of Throckmorton, for appellant. T. J. Wright, of Throckmorton, and Theodore Mack, of Ft. Worth, for appellee.

CONNER, C. J. This is an action of trespass to try title instituted on the 8th day of October, 1912, by appellant, Hardy, against appellee, Wright, to recover the title and possession of 11⅓ acres of land situated in Throckmorton county. The material question presented is whether the evidence is sufficient to sustain the verdict of the jury in appellee's favor on the issue of title by limitation, as pleaded by him.

Briefly stated, the facts are substantially as follows: In July, 1893, appellant conveyed the land in controversy to one Pettigrew, in consideration for which, among other things, Pettigrew gave two promissory notes for the sum of $36.10 each, bearing interest at the rate of 10 per cent. per annum, and payable on or before the 1st day of January, 1895 and 1896, respectively, and reserving a vendor's lien upon the land in question. The notes mentioned have never been paid, but on the 8th day of January, 1896, the land was sold by virtue of an execution against Pettigrew in favor of other parties, at which execution sale B. F. Reynolds and appellee, T. J. Wright, became the purchasers for the sum of $6. Later, Reynolds conveyed his interest in the land to appellee, who soon thereafter went into possession, and who has continuously so remained, claiming and using the land as his own. As explaining appellant's long delay in the effort to enforce his notes, there was evidence tending to show that appellant agreed not to enforce payment against Pettigrew until after he (appellant) had secured a release from a lien against the land in favor of one B. H. Wisdom, and that this lien had not been released until in 1912, and further that the notes had been placed in the hands of Judge Andrews of Throckmorton for collection, and that it was supposed for some time that the notes had been lost during a fire which destroyed Judge Andrews' office. It further appears that appellant and appellee were neighbors, and that appellant during all of the time of appellee's possession knew of the same, and knew that he claimed the land, but appellant denied that Pettigrew or Wright had repudiated the notes in question, or that Wright ever came to him and told him that he was going to claim the land as against the unpaid notes of Pettigrew until sometime in October, 1911. Appellant testified:

"I thought, Judge Wright, that you owned the land, and I thought that you would settle it [the notes] whenever you could or wanted to, and I did not give myself much concern about it; I just thought that you would pay it when-

ever you got in condition that you could do it. I understood that you were claiming the land, and I had no doubt in the world but what you would pay the note when you got ready, or I would not have waited this long, of course; until after I had talked to you several times, and then, of course, I had to resort to other process. Yes; the first time; though that I ever mentioned the matter to you according to my recollection and as far as I can remember was some time in 1911."

Appellee testified on this subject:

"It was my intention after I found out that there were vendor's lien notes against that place that if payment of them was not demanded by the time that limitation would operate, that I would not pay them; in other words, that I would do exactly what I am doing to-day—plead limitation against the payment of these notes. At the same time it was my intention to pay those two notes whenever Dr. Hardy was willing to accept what I believed to be his rightful dues; and that is, namely, interest on them up to their due date in 1895 and 1896, and then interest on them after the time that he was ready, willing, and able to give a clear release against the Wisdom vendor's lien. As I understand it from the record, the release was made on the 17th day of August, 1912, and as I stated it was my intention to pay interest on them up to the time they were due, and then interest on them after the time he could make a release, which I understand from the record he was able to do only since the 17th day of August, 1912. * * * I was ready to do that then, and I am ready to do that now."

Cross-examined, he said among other things:

"As to whether I ever told Dr. Hardy that I was holding the land against him and against these notes, will say, gentlemen of the jury, that the first time that I ever talked to Dr. Hardy about the matter and the first time that Dr. Hardy ever mentioned to me that he had any claim in any way in the world against this property over here was in February or March, 1912; I recall it was just before the May term of the district court; and, as I recall it, the next time that he said anything to me about it was either in September or the early part of October of the same year, 1912, and that is the first time and the only time that I in words told Dr. Hardy that I was going to hold that land against him. I do not remember that I ever discussed the matter at all with anybody else at any time and told them in words that I was holding that land against the vendor's lien and against Pettigrew and against the world. I never told Dr. Hardy that I was holding the land against the world only. I and Dr. Hardy discussed this matter at the two times I told you about. But I was in possession—actual possession—of the land under recorded deeds, and Dr. Hardy was in my house on numerous and divers times, and he knew that I was in actual possession of the land and that I was claiming it, and he knew that I was paying the taxes on it. No, sir; I did not go to Dr. Hardy and tell him that I would pay him as I stated I would do. As to whether I knew that the notes were out against the land, will say that I knew that the record showed them, but I did not know that they were actually unpaid. I just knew what the record showed. It did not show that they were paid."

[1, 2] We think the evidence wholly insufficient to support appellee's claim as against the superior title which remained in appellant by virtue of the reserved vendor's lien. In Gilbough v. Runge, 99 Tex. 539, 91 S. W. 566, 122 Am. St. Rep. 659, our Supreme Court held, in effect, that the vendee in a deed containing a reservation of the vendor's lien holds in subordination to the right of the vendor; that the vendee's possession, or that of any subvendee, is not inconsistent with the right of the vendor, and that a vendee who merely takes possession of land and improves it and pays taxes on it without repudiating the title which remained in the vendor by virtue of the lien cannot resist the right of the vendor. So, in the case of Buckley v. Runge, 136 S. W. 533, by the Court of Civil Appeals for the First District, and in which a writ of error was denied by our Supreme Court, it was held not only that the reservation of a vendor's lien to secure unpaid purchase money upon a conveyance of land had the effect of preserving for the vendor the superior title to the land until the notes were paid, but also that the right of the vendor, or of those legally holding under him, to assert such superior title had not been lost, though nearly 30 years had elapsed since the creation of the lien. The case now before us is not affected by the amendment to our laws found in article 5694 of the Revised Statutes, to the effect that the vendor's right to recover real estate sold by him by virtue of the superior title arising from the reservation of the vendor's lien shall be barred after the expiration of ten years from the maturity of the debt, and we therefore conclude that the cases cited have application here, and that, as already stated, the evidence fails to show such adverse possession of the land in controversy as defeats appellant's right to recover by virtue of the superior title undoubtedly existing in him. Appellee's own testimony shows that, while he claimed the land, used and cultivated it, yet his possession was not inconsistent with the right of appellant, under whom he claimed, and in order to have started limitation he should have openly and continuously manifested the purpose, if any he had, to repudiate the right existing by virtue of the unpaid notes. The mere secret purpose on his part to assert limitation in event legal demand was not earlier made is insufficient. Indeed, appellee's testimony indicates that he, in fact, never had any fixed purpose to repudiate the payment of the notes held by appellant. It certainly cannot be said to have been that open hostile repudiation of appellant's superior right that was necessary to sustain his claim of limitation.

It is ordered that the judgment be reversed, and the cause remanded.