**TEXAS PACIFIC COAL & OIL CO. et al.
v. HAMIL.   (No. 9702.)\***

(Court of Civil Appeals of Texas. Ft. Worth.
Feb. 4, 1922.   Rehearing Denied
March 4, 1922.)

**1. Adverse possession ⊚⟶64—Gifts ⊚⟶25—Parol donee of land bought from state taking possession and paying therefor acquired equitable right under agreement and by adverse possession.**

Where H. purchased land of the state from one claiming to have a right therein during marriage, though it was not applied for and awarded to him by the Land Office until after the wife's death, and he included such land in a partition of the community property on condition that the son to whom it should be allotted would pay the state, and the son and his wife and children paid the state in full and for more than 10 years had possession of the land, they acquired a perfect equitable right, not only by the terms of the agreement, but also by adverse possession, and the patent issued in the name of H. was held in trust for them, though the transaction between H. and his children be regarded as a gift. (Per Conner, C. J.)

**2. Adverse possession ⊚⟶44—Not interrupted by inadvertent omission to pay interest due state on the land.**

Peaceable and adverse possession of land purchased from the state, under a parol gift conditioned that the donee would pay the amounts due the state, was not interrupted by the inadvertent or accidental omission to pay interest, where the application to purchase was reinstated by the Land Office, in view of Vernon's Sayles' Ann. Civ. St. 1914, art. 5423, relative to forfeitures and reinstatements. (Per Conner, C. J.)

**3. Frauds, statute of ⊚⟶129(11), 144—Possession, payments, and improvements held to take case out of statute or estop grantor and one claiming under him to plead it.**

Where a father, in partitioning community property with his children, included land which he had contracted to purchase from the state on condition that the child to which it should be allotted should make the payments due the state, and such child made all necessary payments and was given possession and improved the land, such possession, improvements, and payments *held* to take the case out of the statute of frauds, or, if not, to estop the father and another son to whom he conveyed for a nominal consideration from pleading the statute. (Per Conner, C. J.)

Dunklin, J., dissenting in part.

Appeal from District Court, Stephens County; Harry Tom King, Judge.

· Suit by Oscar J. Hamil against the Texas Pacific Coal & Oil Company and another, in which certain other parties intervened. From a judgment for plaintiff, defendants and the interveners appeal. Reversed and remanded.

W. J. Oxford, of Stephenville, John Hancock and W. B. Powell, both of Fort Worth, Penix, Miller, Perkins & Dean, of Mineral Wells, and Jas. G. Harrell, of Breckenridge, for appellants.

W. A. Shields and K. K. Scott, both of Breckenridge, and Merritt & Leddy, of Dallas, for appellee.

DUNKLIN, J.   Oscar J. Hamil instituted this suit in the form of trespass to try title against the Texas Pacific Coal & Oil Company and the Mid-Kansas Oil & Gas Company to recover title to 160 acres of land situated in Stephens county, Tex.; also to remove as a cloud from plaintiff's title an oil and gas lease on the land executed by Lizzie Hamil for herself and as guardian of the estate of her three minor children to the Texas Pacific Coal & Oil Company, and a deed of assignment by that company to an undivided one-half interest in said lease in favor of the Mid-Kansas Oil & Gas Company.

The two oil companies pleaded a general denial, and not guilty, and specially pleaded the statute of limitation of ten years.

Mrs. Lizzie Hamil, for herself and as guardian of the estate of her three minor children, filed a plea of intervention in the form of a suit in trespass to try title against plaintiff to recover title to the land and to annul and remove plaintiff's claim of title as a cloud upon intervener's title. Interveners further claimed title to the land under the statute of limitation of ten years.

In reply to the plea of intervention, the plaintiff alleged that the interveners were claiming title under a parol contract or agreement, which was void because in con-

travention of the statute of frauds. Plaintiff further alleged, upon information and belief, that interveners had paid certain taxes on the land and certain indebtedness formerly due the state for said land, and in that connection pleaded a tender to interveners of all sums so paid by them with legal interest from date of payment.

Judgment was rendered in favor of the plaintiff for title to the land, for a cancellation of the lease, and the assignment thereof by the Texas Pacific Coal & Oil Company, but further decreed a recovery by the interveners against the plaintiff for the sum of $1,260.26, the amount which interveners had paid out for taxes, improvements, and purchase money to the state of Texas. A writ of restitution was awarded to plaintiff for possession of the land, conditioned upon his paying to interveners the sum so awarded to them, and interveners were also awarded an execution against the plaintiff to collect the amount of the judgment so decreed in their favor.

From that judgment the two oil companies and the interveners have appealed.

The case was tried before the court without a jury, and the trial judge has filed findings of fact and conclusions of law, which, stated in narrative form, are as follows:

"One June 5, 1908, C. M. Hamil filed in the General Land Office of the state of Texas his application to purchase and his obligation to pay the state the purchase price of the north one-half of section 14, block 5, certificate 2/797, Texas & Pacific Railway Company survey of 160 acres, the purchase price being $4 per acre, and the said C. M. Hamil made the cash payment of one-fortieth required by law, which accompanied said application, which said application and award was duly and legally made in accordance with the laws of this state and said land was on the 20th day of June, 1908, duly and legally awarded to the said C. M. Hamil, without condition of settlement.

"(2) On the 31st day of July, 1920, C. M. Hamil, the person to whom the above-described land was awarded, conveyed the same by general, warranty deed to his son by his first marriage, Oscar J. Hamil, in consideration of the sum of $5 cash paid and the assumption by the said Oscar J. Hamil of the amount then owing the state of Texas as purchase money and the further consideration of love and affection; said deed being duly filed for record in the office of the county clerk of Stephens county, Tex., on the 7th day of August, 1920.

"(3) In July, 1908, C. M. Hamil and the eight children of his second marriage had a verbal division and partition of certain lands, the community property of said marriage, the mother of said children dying in 1904. At the time such division was made he told said children that they could take the land lying on the east side of a certain public road and the 'home place' situated on the west side of said road, said home place being the 160 acres of land lying immediately south of the land in controversy, and that he would take the land lying on the west side of the road; C. M. Hamil further 238 S.W.—43

ther stating that whoever got the home place in the division made by the children of the land given them could have the 160 acres in controversy, provided they would pay it out. Thereafter C. M. Hamil sold all of the land received by him in said partition and the various children accepted the portions received by them.

"(4) Thirty-five acres of the home place was in a state of cultivation and on which there was located a two-story five-room house, barns, outhouses, etc.

"(5) In said division made by the children of the community estate of their mother, John W. Hamil was awarded the home place, and that in October, 1908, he, with his family, moved on the home place, adjoining the land in controversy, using the entire 320 acres. The land in controversy was pastured by him with his stock up to the time of his death in 1911, and that after his death his wife Lizzie Hamil moved away from said place and has not since said time resided thereon, she renting the place each year to tenants, who used the land involved for pasturage and grazing stock up until November, 1919, when the fences were torn down on account of oil development in the community, and no one has used or been in actual possession of said property since said date; the improvements on the home place being destroyed by fire in 1914.

"(6) From the date of the division of the community estate of C. M. Hamil's second marriage, John W. Hamil claimed to own the land in controversy up until the date of his death, and thereafter the same has been continuously claimed by interveners.

"(7) John W. Hamil and Lizzie Hamil paid to the state of Texas each and every year all of the interest due the state on the purchase price of said land, except as shown by the succeeding finding, and on August 9, 1920, Lizzie Hamil paid to the state the total sum of $639.-97, being the balance due the state on said purchase, and a patent was issued for said land in the name of C. M. Hamil; all of the state and county taxes subsequent to the year 1908 have been paid by the said John W. Hamil and interveners.

"(8) On the 26th day of July, 1910, the land in controversy was forfeited by the Commissioner of the General Land Office of the state of Texas, for nonpayment of interest, and the same was reinstated on the 5th day of August, 1910; John W. Hamil paid the interest and penalties necessary for the reinstatement of said application, and it was reinstated in the name of C. M. Hamil, in accordance with the original application of the said Hamil.

"(9) The land in controversy was rough, rocky land, fit for grazing purposes, but not suitable to cultivate, and was of the reasonable value of $4 per acre in July, 1908. At the time John W. Hamil took possession of said land there was a fence on two sides of same, it being fenced with a larger tract, and that the only improvements made on same by the said Hamil was to furnish the labor to build a three barbed wire fence on one side of the land a half a mile in length, with mesquite posts cut from the land; it requiring a laborer who was paid by John W. Hamil $25 a month and board one month to construct same, the adjoining landowner furnishing the material at a

cost of approximately $100 to him, the fence being erected as a partnership one. John W. Hamil kept the fences in repair until his death, the extent of the repairs necessary nor the value of same not being shown. After the death of John W. Hamil, whatever repairs were made were made by the tenants of Lizzie Hamil at their own expense. Except as above shown, no other character of improvements were made on said place either by John W. Hamil or interveners. It does not appear that C. M. Hamil had actual knowledge of or consent to the making said improvements by John W. Hamil.

"(10) Lizzie Hamil received as rental for the land in controversy the sum of $140 per year for the years 1911 and 1912, and for the years 1913 to and including the year 1919 she received the sum of $150 per year, the rentals for the last-named years including the home place as well as the land in controversy, and she has received the sum of $1,200 as rentals from the land in question under the oil and gas lease made with the defendant Texas Pacific Coal & Oil Company, and in addition thereto she used said premises as a pasture for stock from 1908 to 1911; the value of the use of such property and the rentals received therefrom by the said Lizzie Hamil each year largely exceed the amount expended for improvements placed thereon.

"(11) A partition suit was filed by the heirs of C. M. Hamil by his second marriage in 1909, after the verbal partition in 1908, and a judgment was entered partitioning said community estate; the 160 acres in controversy not being included therein.

"(12) On December 12, 1916, Lizzie Hamil for herself and as guardian of the estate of her three minor children, Edward Hamil, Curry Hamil, and Reeves Hamil, executed and delivered to the defendant Texas & Pacific Coal Company, now the Texas Pacific Coal & Oil Company, an oil and gas lease on 320 acres of land, being the land in controversy and the 160-acre home place for a period of five years from date and so long thereafter as oil and gas is produced in paying quantities thereon; $480 was paid to the said Lizzie Hamil as a consideration for said lease, and for each and every year subsequent thereto the sum of $1.50 per acre per annum was paid the said Lizzie Hamil as rental by the Texas Pacific Coal & Oil Company and its assignees, Mid-Kansas Oil & Gas Company.

"(13) On the 1st day of May, 1918, the Texas Pacific Coal & Oil Company assigned an undivided one-half interest in said lease to the Mid-Kansas Oil & Gas Company, and said companies are now the owners of whatever interest they acquired by said lease. After the execution of said assignment said companies have paid two annual rentals to the said Lizzie Hamil in the sum of $1.50 per acre per annum which were accepted and retained by her. During the year 1920 said companies drilled an oil well at an approximate cost of $50,000 upon the home place adjoining the 160 acres of land involved in this suit, and obtained oil therefrom in paying quantities.

"(14) C. M. Hamil married his fourth wife, with whom he is now living, in 1907, and the property involved in this suit was acquired by him during this marriage.

"(15) The present value of the land in controversy is the sum of $650 per acre; the increase in value of said land has been brought about by the discovery of oil in the vicinity in which it is located.

"(16) John W. and Lizzie Hamil have paid on said land to the state of Texas, under the obligation of C. M. Hamil, the sum of $1,003.67, and they have paid state and county taxes thereon in the sum of $206.59.

"(17) On January 13, 1909, C. M. Hamil made application to the probate court of Stephens county to be appointed as guardian of his three minor children, Stokeley, Lela, and Lois Hamil, minors who were brothers and sisters of John W. Hamil; said application was duly granted, and on said date the said C. M. Hamil returned and filed in said guardianship proceedings an inventory and appraisement of the estate of said minors, duly sworn to in accordance with law, in which an undivided three-sixteenths interest in the property in controversy was listed as the property belonging to said minors, and thereafter the court duly and legally approved said inventory.

"(18) The original petition was filed herein on October 16, 1920, and citation issued thereon on the same day and was served on each of the defendants on October 21, 1920, and intervener's plea of intervention was filed herein on the —— day of October, 1920, alleging possession of the premises in plaintiff on August 7, 1920.

"(19) On or before July 31, 1920, Oscar J. Hamil had knowledge of the fact that interveners were claiming to be the owners of the land in controversy.

"(20) The consideration paid by the said Oscar J. Hamil to C. M. Hamil for the land in controversy was totally inadequate to entitle him to protection as an innocent purchaser.

"Conclusions of Law.

"I conclude from the above findings of fact that as a matter of law:

"1. The legal title to the premises in controversy is in plaintiff Oscar J. Hamil.

"2. John W. Hamil up to the date of his death, and thereafter interveners, were holding said land under a parol executory contract to pay the obligation of C. M. Hamil to the state of Texas, and by reason thereof their possession was not hostile or adverse to C. M. Hamil.

"3. The forfeiture of said land to the state in July, 1910, revested the title in the state and effectually destroyed whatever rights, if any, John W. Hamil may have previously acquired in said land.

"4. There was no valid oral partition of said land when the community estate of C. M. Hamil and the mother of John W. Hamil was partitioned, for the reason that John W. Hamil and the other children participating in said division had no interest or title in the 160 acres in controversy, the same being community property of C. M. Hamil and his present wife, whom he married in 1907.

"5. From the undisputed evidence in the case, the improvements placed on the premises in controversy by John W. Hamil were not of that permanent substantial and valuable character as would remove a parol gift of real estate from the operation of the statute of frauds.

"6. Defendants nor interveners having shown

an equitable title to said land, and plaintiff having shown a legal title thereto, I conclude as a matter of law that plaintiff is entitled to recover the land in controversy, and under plaintiff's offer to do equity I find that. interveners should recover from plaintiff the 'amount they have paid out as improvements, purchase money, and taxes on said land, and a lien is here now given them on said land to secure the payment of the same."

The finding that on July 26, 1910, the land in controversy was forfeited by the commissioner of the General Land Office of the state, for nonpayment of interest, was supported by the agreement of counsel for appellants during the trial, reading as follows:

"It is agreed that, as shown by the indorsement on the application and obligation of C. M. Hamil, to purchase this land, that the same was forfeited for nonpayment of interest on 7—26—1910, and reinstated 8—5—1910, and that John W. Hamil paid the interest and penalties necessary for the reinstatement of said application, and that it was reinstated in the name of C. M. Hamil, in accordance with the original application of the said Hamil."

That agreement seems to have been made after plaintiff had introduced in evidence the certificate of forfeiture signed by the Commissioner of the General Land Office written across the face of C. M. Hamil's application to purchase the land, as required by the statutes. And after making the agreement quoted, appellants are in no position now to insist that in order to render effective the certificate of forfeiture plaintiff should have made proof of compliance by the Land Commissioner with the additional statutory requirement also to make an entry of forfeiture on the account kept with the purchaser, as provided in article 5423, V. S. Tex. Civ. Statutes.

We approve the trial court's conclusion that since John W. Hamil and interveners took the land and the possession thereof under C. M. Hamil's parol executory contract of gift if John W. Hamil would carry out and perform C. M. Hamil's contract of purchase with the state, the possession of John W. Hamil and interveners, prior to the issuance of the patent, was not adverse to C. M. Hamil, within the meaning of the statute of limitation of ten years, and hence title was not acquired under and by virtue of that statute.

Article 5681, V. S. Tex. Civ. Statutes, which applies to all statutes of limitation for the recovery of title to land, reads as follows:

"Adverse possession is an actual and visible appropriation of the land, commenced and continued under a claim of right inconsistent with and hostile to the claim of another."

In Browning v. Estes, 3 Tex. 462, 49 Am. Dec. 760, a purchaser of land, who had executed his purchase-money notes and had received a bond for title from his vendor but had defaulted in the payment of the notes, resisted a suit by his vendor to recover the land, and in the opinion rendered in that case the court said:

"The defendant has pleaded the statute of limitations, in bar of the action, but this defense is available only where the possession has been adverse, and not when taken by virtue of the assent and permission of the plaintiff. And it is a settled principle of law, that a possession of land, taken under an executory contract for the purchase thereof, is in no sense adverse to the person with whom the contract is made. [Citing authorities.] There are exceptions to the general rule; as for instance, where the whole of the purchase money has been paid, and the stipulations imposed on the vendee by the contract have been fulfilled, he may hold adversely to the vendor, and other circumstances may be imagined, which might impress an adverse character on the possession."

To the same effect are numerous subsequent decisions of our appellate courts, two of which are Gilbough v. Runge, 99 Tex. 539, 91 S. W. 566, 122 Am. St. Rep. 659; Hardy v. Wright (Tex. Civ. App.) 168 S. W. 462.

In 2 Tiffany, Real Property, p. 2010, is the following:

"The possession of the vendee of land under an executory contract of sale is presumed to be in subordination to the rights of his vendor so long as the purchase price has not been paid or the contract is otherwise unperformed on his part, while, by the weight of authority, so soon as he has completely performed his part of the contract, his possession becomes adverse to the vendor, as it does, even before performance by him, if he explicitly repudiates holding under the vendor."

In each of the cases cited there was either a written contract to convey, or a deed of conveyance with vendor's lien reserved, which had the legal effect to retain the superior title in the vendor.

Not only was it conclusively shown that John W. Hamil took possession of the land and claimed title thereto under and by virtue of the parol agreement of his father that he might have it if he would pay out the land to the state, thus recognizing his father's superior title to the land until that obligation was discharged, but he further recognized the superior title in his father by having the award of the land reinstated in the name of his father after it had been forfeited to the state, which reinstatement also had the effect to reinstate the contract of his father to pay to the state the purchase price of the land and interest thereon according to the terms of his obligation 'at the time the land was originally awarded to C. M. Hamil. If at any time prior to the final payment of the purchase money to the state by the interveners, they, or John W. Hamil, had defaulted in the payment of the interest installments, C. M. Hamil could have saved the land from forfeiture by paying the interest and thereupon could have canceled his parol

agreement to give the land to John W. Hamil and could have recovered the land by reason of the breach of John W. Hamil's contract to pay said interest installments, even though proof of the parol agreement of gift had not been forbidden by the statute of frauds.

Article 3965, V. S. Tex. Civ. Statutes, reads, in part, as follows:

"No action shall be brought in any of the courts in any of the following cases, unless the promise or agreement upon which such action shall be brought, or some memorandum thereof, shall be in writing and signed by the party to be charged therewith, or by some person by him thereunto lawfully authorized: * * * (4) Upon any contract for the sale of real estate or the lease thereof for a longer term than one year."

That statute does not render invalid a parol contract to convey real estate, but it forbids proof of the contract and thus defeats its specific enforcement. Robb v. S. A. St. Ry. Co., 82 Tex. 392, 18 S. W. 707; Simpson v. Green (Tex. Com. App.) 231 S. W. 375.

As shown by the findings, the improvements placed on the land by John W. Hamil consisted solely of an undivided one-half interest in a fence, inclosing the land on one side, which cost him $25 in wages paid to his employé and the board of the employé for one month. The value of the board was not proved, and in the absence of such proof the court cannot judicially determine such value, especially in view of the rule that the burden was upon appellants to prove the value of the improvements and such proof, presumably, was peculiarly within their power to produce. Mutual Life Insurance Co. v. Tillman, 84 Tex. 31, 19 S. W. 294; Landon v. Halcomb (Tex. Civ. App.) 184 S. W. 1098; Burnett v. Anderson (Tex. Civ. App.) 207 S. W. 540. It is well settled by the authorities that when the issue now under discussion is involved, the value of improvements must bear some reasonable proportion to that of the land upon which they are constructed; and they must be such as enhance the value of the land to a substantial extent. And under all the facts and circumstances in evidence, I do not believe this court is authorized to set aside the trial court's finding that the improvements made by John W. Hamil was not of that permanent, substantial, and valuable character as would remove the parol gift from the operation of the statute of frauds, and to make another finding on that issue of contrary effect. Ann Berta Lodge v. Leverton, 42 Tex. 25; Eason v. Eason, 61 Tex. 225; Bradley v. Owsley, 74 Tex. 69, 11 S. W. 1052; Cobb v. Johnson, 101 Tex. 440; 108 S. W. 811; Atchley v. Perry, 55 Tex. Civ. App. 538, 120 S. W. 1105, writ of error denied 123 S. W. xix; Martin v. Martin (Tex. Civ. App.) 207 S. W. 188, writ of error denied 208 S. W. xviii; Houston Oil Co. v. Gore (Tex. Civ. App.) 159 S. W. 924; 2 Dev-

lin on Deeds, § 160; 25 R. C. L. pp. 264 and 265.

Nor do I believe it material that the land was suitable for pasturage purposes only and that the fence which John W. Hamil helped to build, when used in connection with fences already on other sides of the land, was the only improvements necessary to make it available for that purpose. And this conclusion is reached irrespective of the question whether or not the amount expended for the fence should be offset to any extent by the value of the use of the premises by John W. Hamil and the amounts collected for rents by interveners after his death, as many of the authorities cited above, and others which might be cited, such as Wooldridge v. Hancock, 70 Tex. 21, 6 S. W. 818, indicate should be done, although in Wells v. Davis, 77 Tex. 636, 14 S. W. 237, and in Hudgins v. Thompson, 109 Tex. 433, 211 S. W. 586, it was held, in effect, that if improvements of the required character are made by the grantee, the value of the use of the land becomes immaterial.

Whether the improvements are made before or after the grantee has used the land or collected rents thereon, possibly, might control in the application of the one rule or the other. If at the time the improvements are made the grantee has already collected rents or used the land himself, then I can perceive equitable reasons for charging such rents or the value of such use against the cost of the improvements; but if improvements of the required character are made prior to such use or the collection of rents, then, perhaps, the cost of the improvements should not be offset by the rents or the value of the use. But even if the value of improvements made by John W. Hamil be not offset by rents or value of the use of the land, I believe the finding of the trial judge, now under discussion, is amply sustained by the evidence and should not be disturbed by this court. And since that finding was a finding of fact, it is immaterial that it appear under the heading "Conclusions of Law." Canadian Mortgage Co. v. McCarty (Tex. Civ. App.) 34 S. W. 306; Robertson v. Kirby, 25 Tex. Civ. App. 472, 61 S. W. 967; Osborne & Beck v. Sanders (Tex. Civ. App.) 184 S. W. 1101; McLane v. Swernemann (Tex. Civ. App.) 189 S. W. 282.

In this state, regardless the rule in other jurisdictions, the essentials necessary to establish title by parol gift or parol sale have been announced in an unbroken line of decisions of our Supreme Court, beginning with Ann Berta Lodge v. Leverton, 42 Tex. 18, and ending with Hooks v. Bridgewater (Tex. Sup.) 229 S. W. 1114, 15 A. L. R. 216, in which latter case Chief Justice Phillips said:

"From an early time it has been the rule of this court, steadily adhered to, that to relieve a parol sale of land from the operation of the

statute of frauds, three things were necessary: (1) Payment of the consideration, whether it be in money or services. (2) Possession by the vendee. And (3) the making by the vendee of valuable and permanent improvements upon the land with the consent of the vendor; or, without such improvements, the presence of such facts as would make the transaction a fraud upon the purchaser if it were not enforced. Payment of the consideration, though it be a payment in full, is not sufficient. This has been the law since Garner v. Stubblefield, 5 Tex. 552. Nor is possession of the premises by the vendee. Ann Berta Lodge v. Leverton, 42 Tex. 18. Each of these three elements is indispensable, and they must all exist. * * *

"The merit of the rule announced by this court in every decision where it has dealt with the subject is that it does this. By its requirement of payment of the consideration, adverse possession by the purchaser, and his making of valuable and permanent improvements in order for the contract to be exempt from the statute, it insures the application of the exemption only for the avoidance of actual fraud, and secures, as it should, the full operation of the statute in all other cases. Its purpose is both to prevent the perpetration of fraud and to safeguard the titles of lands. It is a rule founded in sound reason and common experience, and it is fair and just.·

"There is no fraud in refusing to enforce the contract where only the consideration is paid. The value of the consideration may in a law action be recovered. Nor where only possession of the premises is given. In such case there is no performance by the purchaser of any obligation. Nor even where there is both payment of the consideration and possession; without valuable and permanent improvements made on the faith of contract, or their equivalent. * * *

"But where there is payment of the consideration, the surrender of possession and the making of valuable and permanent improvements on the faith of the purchase with the owner's knowledge or consent, there is created an estoppel against him and it may fairly be said that a fraud upon the purchaser would result if the owner were permitted to repudiate the contract. * * *

"With this the established, and in our opinion the sound, rule of decision in this state, there can be no occasion for enlarging it. When called upon, as here, to disregard it and engraft a further exception upon the statute, we deem it appropriate to say, in the language of the opinion in Ann Berta Lodge v. Leverton:

" 'The propriety of the enforcement of such contracts by courts of equity, under any circumstances, has always been a mooted question. And while it is not to be denied by us that it may be done in such cases as have heretofore been held by the court as authorizing it, we are unwilling to extend its limits beyond the boundaries defined by them.' "

As stated in that decision and as contended by appellants in their briefs, when title passes in such a case it is upon the principle of estoppel, operating against the grantor. But it is settled beyond controversy that possession by the claimant of title and pay-

ment by him of purchase money and taxes, even when there is no chance to recover the money so paid, all with the consent of the grantor, will not, standing alone, estop the grantor. To estop him the grantee must further show that, relying upon the parol gift or sale, he has placed on the land improvements of the character noted. It is not sufficient for him merely to show equities in his favor unless those equities are sufficient to constitute also an estoppel against the grantor. To hold otherwise would render the statute of frauds inoperative in nearly every instance and thereby the purpose for which the statute was enacted would be defeated. And in such cases as the present, improvements made by the grantee of the character mentioned is one of the essentials, without which estoppel against the grantor cannot be established. Although the decisions noted indicate that in the absence of improvements the facts may be such as to make the transaction such a fraud upon the purchaser as would estop the grantor from invoking the statute of frauds as a defense to a suit for specific enforcement, yet it is uniformly held that such cases as this one do not come within that class. The case of Morris v. Gaines, 82 Tex. 255, 17 S. W. 538, does come within that class. The controversy involved in that decision was a suit by Gaines to recover of Morris a part of the total consideration of $1,000 which Morris had agreed to pay for a town lot; the contract of sale and agreement to pay therefor being in parol. When the contract of sale was made Gaines owed a note to one Whitcomb, which was secured by a lien on other property, and Morris agreed with Gaines to pay off that note, and to pay such additional sum as was required to make up the balance of $1,000. Gaines tendered a deed to Morris and testified on the trial that Morris had paid $140 of the note so assumed, but declined to pay the balance on account of some difficulty about the title until the lot could be sold under foreclosure and bought in by Morris, and he proposed that this should be done; that, pursuant to that proposition, Whitcomb procured a foreclosure, Morris accepting service of citation in the suit, and at a sale under such foreclosure, Morris bought in the property for an amount sufficient to pay the balance on the Whitcomb note. In the opinion rendered, Associate Justice Gaines said:

. "The doctrine is well established that where either party, in reliance upon the verbal promise of the other, has been induced to do or to forbear to do any act, and thereby his position has been so changed for the worse that he would be defrauded by a failure to carry out the contract, equity will enforce a performance. It is clear, therefore, that if the appellee, because of his reliance upon the original promise of appellant to pay the Whitcomb note and a sufficient sum in addition for the lot to make $1,000, was led even passively to permit the lot to be sold under Whitcomb's decree and bought

in by the appellant, the statute of frauds is no bar to his recovery of the purchase money."

In the instructive opinion in Lechenger v. Merchants' National Bank (Tex. Civ. App.) 96 S. W. 638 (writ of error denied), that decision was construed as not in conflict with the decision in Ann Berta Lodge v. Leverton, 42 Tex. 25.

Although in the decisions cited the enforcement of the parol gift or sale, when valuable improvements have been made on the faith of the gift or sale, is based on the principles of equitable estoppel, yet the doctrine of estoppel has never been applied in such cases to its full extent. Indeed, if that doctrine be given full force in such cases as this, it would be difficult to imagine a case coming more clearly and cogently within its operation than that of a purchaser who has paid full consideration for the property and is even without remedy to recover from his vendor the consideration so paid. The limitation of the doctrine of estoppel so placed by our decisions like the one at bar, even if an arbitrary one, and even if the same is inconsistent with the general principles of estoppel, yet such decisions have established a rule of property in this state which should not now be changed, and especially by this court, upon whom the decisions of our Supreme Court are binding.

By the judgment rendered in this case the interveners are given full compensation for the amount paid out for improvements, also for purchase money paid for the land with interest thereon, plus all taxes; without being charged with the rents received for the land extending over a period of twelve years and amounting to more than $1,440, or with the value of the use of the land by John Hamil himself for approximately two years. And the payment of those sums is made a condition precedent to the issuance of a writ of restitution of the land in plaintiff's favor. Hence, viewed from the standpoint of equity, aside from the issue of title, John W. Hamil and interveners have suffered no injury but have profited by the transaction with C. M. Hamil, even though they have lost the benefit of John W. Hamil's parol bargain.

In respect to equities in favor of the purchaser, this case is in marked contrast with Hooks v. Bridgewater (Tex. Sup.) 229 S. W. 1114, 15 A. L. R. 216, by the Supreme Court, cited above, in which it appeared that the plaintiff Bridgewater had for many years rendered personal services to John W. Davis, a bachelor, under a parol contract with plaintiff's father, acting for his son, then nine years of age, that in consideration for such services and for the exclusive custody and control of plaintiff during minority, he (Davis) would make plaintiff his heir and leave to him at his death all his property. Although custody of plaintiff was given as agreed and although plaintiff performed all the services contemplated and expected by Davis, the latter died without leaving him any property whatever. Notwithstanding those facts, plaintiff Bridgewater was denied a recovery of any of the property of the decedent. And from the facts recited it would seem that Bridgewater would be without remedy to recover the value of the greater part of his services, at all events, in any other suit.

No witness testified and there was no finding by the trial court that in the partition of property between C. M. Hamil and the children of his second marriage, C. M. Hamil received more property by reason of his agreement to give the land in controversy to the child who received the home place adjoining, or that in the division between the children the promised gift by C. M. Hamil of his title to the land in controversy was considered of substantial value, and that but for same John W. Hamil would have received other property in its stead additional to the homestead. And in the absence of such testimony and of a finding by the trial judge on that issue, I do not believe this court is warranted in concluding that but for C. M. Hamil's agreement to donate his title to the land in controversy, the property would have been divided differently between C. M. Hamil on the one side and his children on the other, or as between the children themselves. Furthermore, Oscar J. Hamil stands in the shoes of his father and has succeeded to all his rights to maintain this suit, regardless of the fact that he paid only $5 for the conveyance to him by his father, and independently of his prior knowledge of the parol gift by his father to John Hamil.

It is insisted further that if the land was forfeited, then a resulting trust in the title was created in favor of John W. Hamil by reason of the payment by him of the amount necessary to have it reinstated. Payment of the past-due interest was the only statutory requirement necessary to a reinstatement of title. Article 5423, V. S. Tex. Civ. Statutes. In paying that interest John W. Hamil was only discharging his original obligation to his father, and the facts show conclusively that in order to discharge that agreement, he paid it and had the land reinstated in the name of his father. The forfeiture to the state carried with it the right to reinstatement and the reinstatement had the legal effect to annul it. The reinstatement was not the origin of a new title. John W. Hamil did not, after that forfeiture, elect to buy the land anew in his own right, as the statute gave him the right to do, but he chose to claim the land under the title already vested in C. M. Hamil and to perfect that title by paying the debt which the latter had agreed to pay for the land and which he (John W. Hamil) had agreed to assume after title had vested in his father. Hence the payment of the past-due interest neces-

sary to a reinstatement cannot be held such a payment of part of the purchase money as would create a resulting trust in favor of John W. Hamil. The payment of part of the purchase money by John W. Hamil at the time the land was sold to C. M. Hamil by the state was necessary to create such a resulting trust. In Williams v. County of San Saba, 59 Tex. 444, our Supreme Court, in an opinion written by Associate Justice Stayton, said:

"This is not a case in which property has been bought with the money or other means of one person, and the deed taken in the name of another, which would create a resulting trust. But it is a case in which the property was bought upon a credit, and a deed made to the purchaser, intended by all parties concerned to vest both the legal and equitable title in the person to whom the deed was made.

"In such case the payment of the purchase money at some subsequent period cannot have the effect of vesting the title to the property in the person making such payment, unless there be a writing between the parties evidencing such intention; for this would be to give an effect to such payment which the law does not attach to it, and it would contravene the spirit and letter of the statute of frauds."

To the same effect are the following decisions: Erp v. Meachem, 61 Tex. Civ. App. 71, 130 S. W. 230; Allen v. Allen, 101 Tex. 362, 107 S. W. 528; Hayworth v. Williams, 102 Tex. 308, 116 S. W. 43, 132 Am. St. Rep. 879; Guest v. Guest (Tex. Civ. App.) 208 S. W. 547; and other decisions there cited.

The evidence pointed out in appellant's brief was not sufficient to support their contention that the defense of estoppel urged against C. M. Hamil and plaintiff, as his assignee, by the Mid-Kansas Oil & Gas Company, was conclusively established. One of the representatives of the Texas Pacific Coal & Oil Company testified that during the summer of 1918 and when the Mid-Kansas Oil & Gas Company was taking over some of the leases of the former company, the witness and one Hodges, the land man of the latter company, went to see C. M. Hamil concerning the title to the land in controversy, who assured them that he claimed no interest therein, that he had given the land to John W. Hamil and his wife, Lizzie, that Lizzie was paying it out to the state, and whatever "Lizzie done was all right; we need not worry about it at all." But no testimony is pointed out, and we have found none, showing that in reliance upon that statement by C. M. Hamil, the Mid-Kansas Oil & Gas Company paid out any money to the original lessee for an assignment of any interest in the lease on the land in controversy, or that it was thereby misled to do any other act to its injury, which otherwise it would not have done. In fact, no well has been drilled on the land in controversy by any one. A well has been drilled on the adjoining tract, jointly by the two oil companies, the Mid-Kansas Company holding an assignment of an interest in that lease, but no testimony has been pointed out to show that the expenditures made by the Mid-Kansas Company, even on that well, were induced by the statements of C. M. Hamil to the representative of the two companies referred to above. Nor did such estoppel arise by reason of the partition between C. M. Hamil and his children, since those children had no interest in the land in controversy, which was acquired by C. M. Hamil after the death of the mother of those children and during his marriage to another wife; and the evidence shows that C. M. Hamil's parol agreement to give the land to John W. Hamil if he would pay it out to the state was a gratuity only.

In the opinion of the writer, the judgment of the trial court should be affirmed, but according to the conclusions reached by the majority, it is reversed and the cause is remanded.

CONNER, C. J. I can and do very readily agree to much that has been said in the well-written opinion of Mr. Justice DUNKLIN, but have, on the whole, been unable to concur in the final conclusion announced therein. In the effort to suggest the lines of thought which have influenced me to the contrary, I wish to briefly refer to a number of facts clearly shown in the evidence that do not appear in the opinion of Mr. Justice DUNKLIN, nor in the trial court's conclusions of fact.

[1] It is true that the record shows that the 160 acres of land in controversy was applied for and awarded to C. M. Hamil on the 20th day of June, 1908, after the death of the mother of the interveners, which act doubtless induced the trial court's conclusion that the land was not subject to the parol partition between C. M. Hamil and the interveners. But the appellee Oscar J. Hamil, among other things, himself testified, in reference to the land in question (and I find no contradiction of his testimony in the particulars noted), that—

"Prior to 1908 I put the fence around the biggest part of it myself. That was when my father lived on the home place and before there was any division made of the estate. I put the fence on the west and north. I worked for my father when I put the fence there. * * * I fenced this land for my father when I was a very small boy, but in 1900, I believe, I came back in the fall—I had been away, and I came back and spent the winter and repaired all the fences around the place. That included this 160 acres. It was like this; I helped build this fence when I was a boy, but, of course, father and the rest of them taken part. I understood my father bought the claim on this land about this time and gave a shotgun for it. I understood he gave it to a fellow named Phillips."

The evidence shows that the period covered by the testimony quoted was during the

marriage of C. M. Hamil and the mother of the interveners, and hence whatever right, if any, that C. M. Hamil acquired by his purchase from Phillips, must have been considered as belonging to C. M. Hamil and his then wife. The evidence does not show whether or not Phillips had theretofore made an application to the state for the purchase of the 160 acres so sold to Hamil, or whether he had merely settled thereon under some claim or right with a view of acquiring title, and while in that condition sold to Hamil, Hamil purchasing, as stated by appellee, in the loose and ineffective way so frequently done by pioneer settlers in the early history of the country when a writing was not considered more sacred than the spoken word. But however this was, it is evident that C. M. Hamil asserted a claim to the land prior to the time of the application to purchase he made in 1908, and hence furnished reasons in conscience and the early faith actuating C. M. Hamil to treat the land as community property and to include it with lands to be partitioned between himself and his children, who are the interveners in this case.

The evidence further shows without dispute that in addition to the lands partitioned, certain cattle were also divided between C. M. Hamil and the interveners. The number of cattle received by each heir and what became of them, or the number of acres of land received by the several heirs in the partition, does not appear, save that it does appear that two daughters received 200 acres of land each, and that deeds by the parties to the partition were passed to confirm the titles thus acquired; the land in controversy not appearing to have been conveyed, presumably for the reason that the title was supposed to be in the state. Nor does it appear that C. M. Hamil ever left the country, or on any occasion from the time of the partition until the date when appellee secured a deed from him, ever claimed the land in controversy or contested John Hamil's or his surviving wife's right to possession thereof. On the contrary, there is uncontradicted evidence tending to show that he remained in the country and on more than one occasion distinctly declared that he had given that land to John Hamil. Nor does it appear that he claimed the land or objected to its continued possession by John Hamil after its forfeiture in July, 1910. Nor does it appear that the wife of C. M. Hamil, living at the time the land was applied for in July, 1908, has ever asserted any right or claim thereto. It further appears without dispute that since the partition C. M. Hamil has conveyed to others all the land by him acquired in the partition, as has also been done by one or more of the children participating therein.

The evidence also shows without dispute that the land, as expressed by one of the witnesses, "was rough, broken land, not subject to cultivation," of little worth at the time,

but which later, together with other lands in the vicinity, greatly increased in value.

In view of the circumstances above referred to, and of those found by the trial court and recited in the opinion of Mr. Justice DUNKLIN, I do not think sufficient emphasis has been given to the evidence in support of the interveners' plea of limitation. If the transaction between C. M. Hamil and his children be construed as a gift, as it seems appellee insists, and as there is perhaps evidence tending to show, there is high authority to the effect that the possession of John Hamil and his surviving wife and children ripened into good title long before this suit was filed, on October 16, 1920. Indeed, more than ten years elapsed between the date of forfeiture, July 26, 1910, and the filing of this suit. In Wood on Limitation, vol. 2, p. 651, it is said:

"An entry under a parol gift of certain lands, the extent of which is definitely fixed, is adverse to the donor, and ripens into a title after the lapse of the requisite statutory period. There are cases in which a contrary doctrine is held; but the weight of authority, as well as common sense and the principles applicable to adverse possession, seem to support the rule as stated, because a person entering under such circumstances enters as owner, and occupies under a claim of ownership, and every attribute requisite to acquire a title by adverse possession exists."

[2] Nor am I inclined to the view that the forfeiture, upon which so must stress is laid, was such as to interrupt the peaceable and adverse possession of the interveners. Article 5423, V. S. Tex. Civ. Statutes, provides, so far as pertinent, that—

"If upon the first day of November of any year any portion of the interest due on any obligation remains unpaid, the Commissioner of the General Land Office shall endorse on such obligation, 'Land forfeited,' and shall cause an entry to that effect to be made on the account kept with the purchaser; and thereupon said land shall thereby be forfeited to the state without the necessity of re-entry or judicial ascertainment, and shall revert to the particular fund to which it originally belonged, and be resold under the provisions of this chapter, or any future law."

Forfeitures are not favored, and it was not affirmatively shown that there was an actual default in the payment of the interest, and that because thereof the Commissioner not only indorsed on C. M. Hamil's obligation, "Land forfeited," but also caused "entry to that effect" to be entered on his account so as to completely reinvest the title in the state. It was only after performance by the Commissioner of the particular steps prescribed by the statute that the state reacquired its title, unaffected by C. M. Hamil's application and obligation. That the forfeiture was so grounded and of such effect is a mere inference from the agreement of coun-

sel which is quoted in Mr. Justice DUNK-LIN'S opinion. But I submit that such construction of the agreement, while plausible, is a harsh one and seems to be rebutted by the admission and finding that—

"J. W. Hamil and Lizzie Hamil paid to the state of Texas each and every year all of the interest due the state."

As found by the trial court, the forfeiture was on the 26th day of July, 1910, and was reinstated on the 5th day of August, 1910, and construing the record as a whole, it seems evident to me that if on the 26th of July, 1910, there was a default of interest, it was one of those inadvertent or accidental omissions to pay that have so frequently occurred with purchasers of school and university lands, and which omission was promptly rectified within a few days after notice. It is difficult for me to see why, if the forfeiture reinvested title in the state, the rescission of the forfeiture by the Commissioner and reinvestment of the account did not have the effect of rendering the forfeiture as if it had never taken place, for article 5423 of the statutes provides that in event of forfeiture it shall thereafter be resold under the provisions of the chapter, which was not done. It further provides that in case of reinstatement without the intervention of another's right, "the original obligations and penalties shall thereby become as binding as if no forfeiture had ever occurred." So that, as a whole, I think the state should be reciprocally bound, and that the forfeiture relied upon is of no effect in the consideration of this case.

The cases of Browning v. Estes, 3 Tex. 463, 49 Am. Dec. 760, Gilbough v. Runge, 99 Tex. 539, 91 S. W. 566, 122 Am. St. Rep. 659, and Hardy v. Wright (Tex. Civ. App.) 168 S. W. 462, cited in the opinion of Mr. Justice DUNKLIN in opposition to the interveners' plea of limitation, were cases of sale in which the vendors held the legal title, and the vendees were in default in the payment of the purchase money. But such is not the case here, nothing was due to C. M. Hamil by John Hamil. C. M. Hamil was shown to only have the right to acquire title by fulfilling the conditions of payment to the state. The legal title was in the state and not in C. M. Hamil, and it has a number of times been decided that the fact that the legal title remains in the state will not defeat the right to acquire land by limitation against one to whom it has been awarded upon an application for its purchase under our laws. See Parker v. Brown, 80 Tex. 555, 16 S. W. 262; Dutton v. Thompson, 85 Tex. 115, 19 S. W. 1026; Thompson v. Dutton, 96 Tex. 205, 71 S. W. 544; Paterson v. Rector (Tex. Civ. App.) 127 S. W. 561.

Browning v. Estes, 3 Tex. 462, loc. cit. 476 (49 Am. Dec. 760), after confirming the general rule that one who takes possession by the consent of another may not plead limitation as against such other, has this to say on the subject:

"There are exceptions to the general rule; as for instance, where the whole of the purchase money has been paid, and the stipulations imposed on the vendee by the contract have been fulfilled, he may hold adversely to the vendor; and other circumstances may be imagined, which might impress an adverse character on the possession."

As I construe the undisputed facts and findings, John Hamil acquired possession of the land in controversy under a contract that as such is conceded to be perfectly valid. By the terms of the agreement in consideration thereof, C. M. Hamil, in the nature of an exchange of properties, received lands of equivalent value in the partition, and that by virtue of such contract John Hamil secured the right, which C. M. Hamil ought not to be permitted to breach, to pay to the state of Texas all sums of money necessary to its protection and to its full and final acquisition from the state, and that when this was done, as in this case, the interveners' equitable right to the land became perfect, not only by the terms of the agreement between C. M. Hamil and his children, but also because the adverse possession of John Hamil and his surviving wife and children related back to the inception of their possession, and hence the patent in the name of C. M. Hamil was thereafter held in trust for John Hamil and those claiming in his right.

As illustrating my conception of the right acquired by John Hamil in the partition agreement, I wish to refer to what, among other things, was said in Browning v. Estes, supra:

"The possession of the vendee, who entered with the assent of the vendor, is lawful, nor can it be disturbed so long as he performs with fidelity the obligations imposed by the stipulations of the contract, and those which flow from the relation subsisting between the vendor and vendee."

And I know of no case where a vendor has been permitted to disaffirm a sale where the vendee has so complied with the conditions under which he purchased and took possession. The only condition under which John Hamil took possession of the land in controversy was that he should pay the state of Texas principal and interest due by the terms of C. M. Hamil's obligation. This, as already stated, I think he acquired the right to do, and these conditions having been fully complied with, equitable title became fully vested in the interveners in this case.

[3] But aside from the issue of limitation and the effect of the partition agreement, as above discussed, and further considering the case as affected by the statute of frauds, I do not think sufficient force has been given to

the character of improvements made on the land in controversy. It is uniformly held in this state that a verbal sale or gift of land, followed by delivery of possession and valuable improvements made thereon, will take the gift or sale out of the statute of frauds, upon which the appellee in this case relies. And whether the transaction between C. M. Hamil and his son John Hamil be treated as a gift or a sale, there was undoubted delivery of possession and long-continued recognition of the right thereto by C. M. Hamil and all other interested parties, and while such gift and possession, followed by insignificant improvements, such as building a chicken coop at a cost of $15 (see Cobb v. Johnson, 101 Tex. 440, 108 S. W. 811), or a small smokehouse, of inconsiderable value (see Eason v. Eason, 61 Tex. 225), or a small hogpen, of no value (see Bradley v. Owsley, 74 Tex. 69, 11 S. W. 1052), will not take the parol gift or sale out of the statute; yet I find no decision which undertakes to define the precise ratio that the value of improvements must bear to the value of the land.

The case of Wells v. Davis, 77 Tex. 636, 14 S. W. 237, was an action in trespass to try title against Mrs. Nellie Davis to recover a house and two adjoining lots. She introduced evidence of a parol gift of the property and that she had expended about $187 improving it. The evidence showed that the original cost of one of the lots was $250 and of the other $150. A decree in favor of Mrs. Davis was affirmed. In the case now before us it is to be remembered that the land was of no considerable value at best, that it was rocky, rough land, unsuited for cultivation, and that the fencing built by John Hamil was the only character of improvement to which the land was adapted, and all that was required in order to segregate it from all other lands and to give notice to the world that it was claimed and possessed by John Hamil. While the evidence fails to show in dollars and cents the value of the board of the hand who the court recites built the fence, the evidence nevertheless undoubtedly does show that John Hamil himself, and perhaps others also, assisted in building the fence, and it is not unfair to presume that such board and assistance in labor was also of value. There was also further evidence that the building of the fence was by agreement with the adjoining owner considered the equivalent of the cost of the material paid for by him, to wit, $100. So that, as it seems to me, it ought not to be said that the improvements were of such insignificant value as to be wholly disregarded. Nor do I think the fact that the use and rentals of the land exceeds the value of the improvements should be held to destroy their effect. In the case of Wells v. Davis, supra, the court, after referring to cases, said on this subject:

"These cases cannot, however, be invoked as authority for the proposition that specific performance of parol contracts for the sale of land will not be enforced in any case where the evidence may show that the value of the use and occupation of the premises have been greater than the cost of the improvements.

"To hold in such cases that the purchaser under a parol sale or gift must be held to account for the value of the use and occupation of the premises is to treat him as a renter or trespasser instead of as a purchaser, and is inconsistent with the theory upon which specific performance has been decreed in such cases."

But if it should be said that the improvements in this case of themselves were insufficient to take the case out of the statute of frauds, nevertheless such improvements, together with the other circumstances, may be considered in determining whether or not it would be now inequitable to refuse to give effect to the gift, if it must be so termed.

True, there is a school of thought referred to, perhaps with approval, in the cases of Ann Berta Lodge v. Leverton, 42 Tex. 25, and the recent case of Hooks v. Bridgewater (Tex. Sup.) 229 S. W. 1114, 15 A. L. R. 216, that seems reluctant to favor any exception to the statute of frauds; but the eminent judges who wrote the opinions in those cases were not considering, nor called upon to consider, whether, in the absence of permanent and valuable improvements, other equities might not exist that would take the case out of the statute. In the Ann Berta Lodge Case, the court found that, as alleged and proven, there were no improvements of value that could be considered, and the authorities were discussed with a view of supporting the conclusion reached that mere delivery of possession and tender of the purchase money under a parol contract was insufficient; nor did the other case, Hooks v. Bridgewater, so much relied upon, involve the proposition I seek to support. That was a suit against an administrator to enforce a parol agreement by a deceased owner to devise his property to the plaintiff in consideration of care and services to be performed. It was shown that plaintiff had performed as agreed upon, and the ruling was merely to the effect that the performance of service was but an equivalent for the payment of purchase money, and that in accordance with the authorities the parol agreement with payment of the consideration would not be enforced as against the statute of frauds. But there were no improvements shown in that case, and in neither case is there a distinct declaration that equities other than what arises out of delivery of possession and improvements in good faith may not be shown with the same effect.

In support of the principle that I think should be applied in this case, the following quotations from the authorities are presented:

"The court of equity has, from a very early period, decided that even an act of Parliament shall not be used as an instrument of fraud and if in the machinery of perpetrating a fraud, an act of Parliament intervenes, the court of equity, it is true, does not set aside the act of Parliament, but fastens on the individual who gets a title (or right) under that act, and imposes upon him a personal obligation, because he applies the act as an instrument for accomplishing a fraud. In this way the court of equity has dealt with the statute of frauds." Devlin on Deeds, p. 130, § 139.

"And it has been decided that where the circumstances of the parties had become so changed that the purchaser would suffer a great loss, such as the insolvency of the party, or enhanced value of the property, a court of equity would decree a specific performance." Wood v. Jones, 35 Tex. 65.

"It is stated, however, in Wells v. Davis, 77 Tex. 636, 14 S. W. 237, that, if other circumstances of a case entitle the vendee or donee to a decree of specific performance, the question of improvements must be treated as immaterial." Altgelt v. Escalero, 51 Tex. Civ. App. 108, 110 S. W. 989.

"If the * * * circumstances of the case are such as to entitle the vendee or donee to a decree for specific performance the question of improvements must be treated as immaterial." Wells v. Davis, 77 Tex. 636, 14 S. W. 237.

"The rule in this state is well established that verbal contracts for the sale of land will not be enforced without proof of possession and valuable improvements permanent in character, or of other facts making the transaction a fraud on the purchaser, if not enforced. * * * Such possession, with payment of the purchase money and improvements of a permanent character enhancing the value of the premises, or such possession without improvements, connected with other circumstances making the transaction a fraud upon the purchaser if the agreement is not enforced, will take the case out of the statute of frauds." Bradley v. Owsley, 74 Tex. 69, 11 S. W. 1052.

"The doctrine is well established that where either party, in reliance upon the verbal promise of the other, has been induced to do or to forbear to do any act, and thereby his position has been so changed for the worse that he would be defrauded by a failure to carry out the contract, equity will enforce a performance." Morris v. Gaines, 82 Tex. 255, 17 S. W. 538.

"The doctrine is well established that where one party, relying upon the verbal promise of another, has been induced to do an act whereby his position has been so changed for the worse that he would be defrauded by a failure of the other to comply with his contract, equity will enforce a performance at his instance. Morris v. Gaines, 82 Tex. 255, 17 S. W. 538; Hand v. Nix (Tex. Civ. App.) 87 S. W. 204." McKinley v. Wilson (Tex. Civ. App.) 96 S. W. 112.

"From an early time it has been the rule of this court, steadily adhered to, that to relieve a parol sale of land from the operation of the statute of frauds, three things were necessary: (1) Payment of the consideration, whether it be in money or services. (2) Possession by the vendee. And (3) the making by the vendee of valuable and permanent improvements upon the land, with the consent of the vendor; or, without such improvements, the presence of such facts as would make the transaction a fraud upon the purchaser if it were not enforced." Hooks v. Bridgewater (Tex. Sup.) 229 S. W. 1114, 15 A. L. R. 216.

"While a parol sale or gift of land may be sustained in equity when it is followed by the possession of the grantee or donee who makes valuable improvements thereon in good faith (Wootters v. Hale, 83 Tex. 563, 19 S. W. 134), yet it does not follow that the validity of such sale or gift may not be sustained in the absence of valuable and permanent improvements." Ryan v. Lofton (Tex. Civ. App.) 190 S. W. 752.

"Upon whatever grounds, however, parol sales of real estate have been upheld in other jurisdictions, we are satisfied that in this state they are upheld on the theory of estoppel. We do not pause to discuss the point, but content ourselves with the citation of representative cases. Wooldridge v. Hancock, 70 Tex. 21, 6 S. W. 818; Lodge v. Leverton, 42 Tex. 18." Bringhurst v. Texas Co., 39 Tex. Civ. App. 509, 87 S. W. 897.

"Mr. Justice Lipscomb, in the case of Love v. Barber, remarks, quoting in part from Lord Denman: 'The doctrine of an estoppel, not of record or under seal, called an estoppel in pais, was left for a considerable time in a state of perplexity and uncertainty. It is, however, believed that various adjudications have settled the doctrine on principles easy to be understood. Nowhere has it been more concisely and clearly laid down than by Lord Denman in the case of Pickart v. Sears, Eng. C. L. Rep. vol. XXXIII, p. 117. He says, "that the rule of law is clear that when one, by his words or conduct, willfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things, as existing at the same time; and the plaintiff in this case might have parted with his interest in the property by a verbal gift or sale, without any of those formalities that throw technical obstacles in the way of legal evidence." (See Walker's Administrator v. Livingston et al., 3 Tex. R. 93.) This rule is much to be admired for its simplicity, its briefness, and it yet being expressive of the whole doctrine on the question.'" Ragsdale v. Gohlke, 36 Tex. 286.

Bearing in mind the principles so announced, I can but think that C. M. Hamil and those claiming under him with notice of the facts, as is the case of appellee Oscar Hamil, are estopped from now claiming the land in controversy. Whether or not it was, strictly and legally speaking, the community property of C. M. Hamil and the mother of the interveners, it was nevertheless so treated by all parties. It was placed in hotchpotch with other lands and property of that community estate with the undisputed declaration that the child to whom the home place should be allotted should have the land in controversy.

Reasoning from the ordinary impulse that

actuates humanity in the care of their own, it is but fair to assume that C. M. Hamil so placed the land in controversy, together with the other lands to be divided among his children, in order to equalize the value of the children's part with the value of that taken by himself; in other words, it is fair to assume that C. M. Hamil, in accepting the land he did accept in the partition, received in values more than he otherwise would have received, and the children, in making the partition among themselves and in awarding to John Hamil the home place, also acquired greater values by the addition of the land in controversy to the home place. There is nothing to show that if the land in controversy had been excluded from that partition, either John Hamil or C. M. Hamil or any of the others would have estimated the value of the old home place equal to the value of the shares received by the other participants. It is evident, as it seems to me, that by the parol gift, if it must be so termed, together with the delivery of possession, John Hamil was induced to alter his position, and inasmuch as C. M. Hamil and a number, if not all, of the other participants in the partition, have sold their lands, now of largely increased value, it is now impossible for John Hamil, or his heirs who succeeded to his right, to be given any part thereof.

There is no equity to invoke in behalf of appellee. He is the son of C. M. Hamil and C. M. Hamil's first wife, and he testified that he was 42 years old. C. M. Hamil had eight sons and daughters, three at least of lawful age, by his second wife, at the time of the partition, and must have been a very old man at the time appellee procured the deed from his father. Appellee testified that he had been in Montana and in other places occupied as a stockman, hotel keeper, a barber, and bar keeper, and that upon his last return to Texas he learned that the land in controversy was still in his father's name, and that—

He "went to him (C. M. Hamil) and asked him if he had deeded it away or given it away, and he said, 'No,' he had forgotten all about it. I asked him if I could have it, and he said, 'Yes.' I said, 'Make me a deed,' and he said, 'Come on.' That was all that was said. My father had forgotten all about that land out there. He said he had gotten him in such an uproar and said he had forgotten, in fact, didn't know it was out there; didn't know he had any claim to it. And I asked him to make me a deed."

On cross-examination, he said, among other things:

"I paid my father this $5 to make it legal; that is the way the deed was drawn. * * *

Nobody told me to pay him. I had made trades before. You ask if in my opinion it would not have been legal if I did not pay the $5. What is the use of mentioning if I was not to pay it. My only reason for paying it was to make it legal."

There is no testimony which furnishes a reason for the old father to favor the appellee over his son John, or the interveners. The execution of the deed in favor of appellee was certainly not because of any failure on the part of John Hamil and interveners to comply with the conditions under which they took possession of the land. The only pretext that could be assigned for such action is the failure, if any, to pay the interest due the state in 1910, but no complaint on the part of C. M. Hamil was made of that failure, if any, for long years thereafter, which in any view of the case should be deemed waived. The conditions under which John Hamil took possession were in the nature of conditions subsequent, and it is well established that a vendor may not re-enter upon a breach of a condition subsequent without notice thereof. It certainly could not operate, ipso facto, as full reinstatement of his original right.

Without further discussion, I conclude that John Hamil, by an agreement not invalid in equity, acquired the land in controversy (subject to the condition of payments of dues to the state, of course), in a parol partition, and that thereafter his possession and improvements, and the long-continued and final payments, were such as to authorize and require the enforcement of such agreement and take this case out of the statute of frauds, or that if the improvements and payments of themselves are insufficient to have this effect, nevertheless such improvements, together with such possession and payments, the largely enhanced values, and all other circumstances, raise such an equity in the interveners in this case as to estop either C. M. Hamil or appellee Oscar J. Hamil from pleading the statute. To hold otherwise, as it seems to me, is to make the statute pleaded by appellee work an irreparable fraud upon the appellants, and to enable appellee to use the statute as an instrument to despoil the surviving widow and children of his deceased brother.

I therefore think the judgment below should be reversed and the cause remanded.

BUCK, J. Without concurring with all that Chief Justice CONNER says, I do agree with the final conclusion reached by him, and agree that the trial court's judgment should be reversed and the cause remanded.